Mr. Juhic was convicted of receipt and transportation of child pornography after a jury trial. He raises several challenges to his conviction. Today, I'll start at the end and begin by discussing the refusal to recess deliberations for a visibly ill juror, and then switch to the introduction of several computer reports and reach other issues if time so allows. First, the district court abused its discretion in refusing to recess jury deliberations two hours early for a seriously ill juror. This refusal also violated Mr. Juhic's constitutional rights. To set the factual scenario of what was occurring at this time, the jury was sent back for deliberations at roughly 3 PM. After the alternates were excused, it was brought to the district court's attention that there was a juror that was unwell. The parties were able to immediately determine who it was, as this juror was unwell during the trial. The district court, outside the presence of the parties, questioned this juror about how she was feeling and her ability to continue deliberations. The juror made comments of, if it's not that much longer, I should be OK, indicated that she hadn't received the type of medication that could actually help with the ailment she was suffering for. And at the time, before she was brought in, she was wearing sunglasses. She had her knees tucked up under her chin and just generally looked like she was in discomfort. And the court, when it determined that it was not appropriate to recess deliberations to allow any medication to take any effect or to allow the juror to recuperate from this migraine, determined that it was a viable solution that there was a physician's assistant on the jury panel who could assist the juror if there was any kind of medical need necessary. It was an abuse of discretion here to not recess and allow the jury to come back the next day to deliberation because of the interests of justice. Two hours is not much to ask in a case like this, where it's a very serious federal charges and he's facing decades in federal prison. And this court has been critical of district court judges not just willing to recess or allow to make accommodations for jurors so that jurors can be present watching the trial and able to deliberate fully in the rush case. And the cases cited by the government on this principle are not on point. The cases cited by the government are all situations where, in the midst of trial, a juror becomes ill. The court does recess to allow the juror to either receive what care is necessary or to recuperate. And then they continue trial, and then there's a later motion for a mistrial. That's not what happened here. For one, we're in deliberations. And two, there was no recess to allow the juror to recuperate. So those cases aren't on point and are not persuasive. It's also problematic because of the constitutional implications of this decision. First, it implicated and offended his right to a fair and impartial jury under the Sixth Amendment. It's not only just the fact that one of the jurors was visibly ill and indicated that she was struggling not only to look at the juror screen to see where the exhibits are pulled up, but just had difficulty looking up in general because of the lights in the courtroom. It's that the other jurors, who are going back with her and deliberating, and seeing this juror with her knees tucked up, wearing big sunglasses, and the impact it might have on them. I think it's the human reaction to feel sympathetic and probably want to get out of there as soon as possible. And the fact that they deliberated only for 40 minutes supports the idea that the jury wanted to move quickly. It also implicates the due process right to a mentally competent jury. This juror, even during trial, it indicated she was having trouble actually clearly focusing and paying attention. She couldn't look up. She had difficulty looking at the screen. And she was sick going into deliberations. And under these circumstances, due process is implicated when it even creates a likelihood or appearance of bias or any kind of issue with the jury. And here, it does. Next, the introduction of several computer reports that were similar to police reports and contain legal conclusions was error and requires reverse enroman for a new trial. So we're challenging seven different exhibits, 1 through 4 and 14 through 16. Exhibits 1 and 3 discuss files that are considered child notable. And testimony at trial indicated that child notable meant these were confirmed child pornography. Exhibits 2 and 4 are summary reports from a file sharing program. And similarly, they discuss child notable or known series. And testimony indicated that these were confirmed child pornography. Who confirmed them? Who confirmed them? I don't know if it's discussed in the testimony. Usually, it's confirmed by the National Center for Missing and Exploited Children. I don't know if the testimony actually said it's been confirmed by them or just generally stated, we know that's child pornography. But I know that when they do state it's a confirmed series by the hash files, based off my experience, it's NCMEC who's doing that. But essentially, the testimony stated, this is child pornography. We have these reports that say child notable. So that means it's child pornography. These reports are all hearsay, as they include out-of-court statements offered for the truth of the matter asserted. And this is controlling under the Morrissey case from this court. And the problematic part of this is that it includes legal conclusions for the jury, which is the most problematic part of this. The government's two bases for why it's not hearsay should be rejected under the circuit's case law. First, they state it's not hearsay because it's not offered for the truth of the matter asserted. This isn't supported by how the evidence was presented by the government and how it was relied upon. And it's also not supported by the case law. This was offered for its truth, and it was offered to show that he had those files on his computer, or they were downloaded from his IP address, and also to establish that they were child pornography. But this exception doesn't come into play. The idea that it's not offered for its truth because it's necessary to show the police investigation is only allowed when the propriety of that investigation is challenged. And here, there's no challenge to the search warrant or why they did it that was a relevant part to the trial. So that just does not come into play. Isn't there also usually a limiting instruction when that happens? Generally, yes. When something's offered for its truth, district court judges usually give some kind of limiting instruction. The judge here let it in under the business records. Right. And the government's abandoned that. Yes. Was that the argument the government made in the district court? I don't believe so, Your Honor, but I don't recall. I know the government's at least arguing now that it's also not hearsay because it doesn't actually include a statement. It's just something that a computer prints out, and it's hard data. That's not what it is in this case. There's a distinction in this line of cases when we're talking about computer reports that the court recognized in Morrissey and other courts have recognized. When something requires actual human input, then it's not just something that a computer is spitting out hard data. Then you do have the statement that's offered for its truth and is hearsay and is it admissible. And this was not harmless because it is essentially evidence telling the jury that an element of the offense is met, and that considering the remaining evidence against Mr. Jewish, it is not harmless. If there are no immediate questions, I would reserve the remainder of my time for rebuttal. Why don't you address why it's not harmless? OK. The government says there's overwhelming evidence here. Even if these reports were mistakenly received, I guess, first of all, would it be a non-constitutional error? So yeah, there was no confrontation clause challenge made. So if it's a non-constitutional error, we would use the Kadiakos standard. And these reports didn't substantially influence the verdict. What do you say to that? Well, two main things, Your Honor. The one is it's not just like one line of questioning or one piece of evidence. This is numerous reports. It's multiple exhibits that came in. And also, it's not just something that could have maybe been prejudicial. This was evidence that told the jury that an element of the offense was met. It took a decision away from the jury, in effect. And looking at the remaining evidence against Mr. Jewich. Which element do you mean? That it was considered child pornography. Well, didn't they have the images before them? They did have the images. But just that. Isn't it obvious that it's child pornography? It's just the harm of telling the jurors that an element has been met. OK. And the remaining evidence, the interrogation, there's questions about whether the interpreter and he understood what was actually happening. And the remaining evidence is insufficient for the government to meet its burden to establish any error was harmless. Did you argue about the summary exhibit? Or are you just arguing orally about the other ones? I'm just arguing orally about the others. We did argue about the summary exhibit. But I acknowledge it's not as problematic as the other ones. Because it doesn't include those legal conclusions that are in the remaining exhibits. Going back to the harmless error, I had made a note to myself that the appellant made statements confessing or admitting to the status or the pornography part of this. Is that correct? Yes, Your Honor. Why wouldn't that take care of the harmless error? Because our position is that really can't be considered reliable evidence due to the interpreter issues and just the language barriers that were implied during that interrogation. That's what you were talking about a moment ago. The confession might not be reliable. Is that the point? So the confession where he says, yeah, there's over 1,000 images of child porn. And you come back with 1,500 images of child porn. That's not reliable because he didn't understand? Well, that's our position. And it might also tie into the argument that he should have been able to put on that theory of defense. And that could have also played into it as well. All right, very well. Mr. Gomer, we'll hear from you. Thank you, Your Honor, for the police, the court, Ms. Quick. I'm going to confine my remarks here today. The court would like to hear on the other issues to the issues Ms. Quick spoke about. As far as the juror issue is concerned, I would invite the court to look in the transcript, and it's around pages 319, 320, and 321, and examine what exactly transpired in this case. At about 2.57 in the afternoon, after the alternate jurors had been excused, one of the jurors reported that she had a headache. She didn't look very well, and she met with the judge. She said she had just taken ibuprofen a little while ago to try and help with the headache. Judge Rose had significant discussions with her. I think the juror asked if she could have a type of medicine, naprexin, or something along that line that helps with her migraine headaches. Court took a recess. I believe the court got the juror a version of the medication that she requested on page 321 of the transcript. You'll find that the judge reported to myself, to co-counsel, to defense counsel Mr. Ross Boone, that she had visited with the juror. The juror said the medication was starting to help. The judge had asked the juror if she felt she could continue to deliberate if she wanted to deliberate. The juror said, yes, she was fine to go on. And the judge said that she looked fine. So based on the record, I just don't think there's anything factually in this record that substantiated that a continuance was warranted at that time for those reasons. Therefore, I don't believe Judge Rose abused her discretion by failing to grant the request for a recess. The other issue that we're talking about here today are a number of exhibits that we offered at trial exhibits. And I'm going to talk about them in clusters and try and explain to the court, if I can, what exactly they are and some distinctions between the exhibits. Exhibits 1 and 3, well, first of all, exhibits 1, 3, 2, 4, 15, and 16 are all computer-generated exhibits. Some of them come from different programs. And I'll get into that in a moment. Exhibits 1 and 3 come from a computer program called CPS. And the CPS reports were generated when a computer operated, sitting there operating, but it was a law enforcement tool, the case agent in this particular investigation, connected to Mr. Uhig's computer. And what was being told to the law enforcement computer through the CPS program, this is what it discovered on Mr. Uhig's computer. First, according to the CPS reports, it gave the IP addresses. What IP address are you connecting to? That's akin to a statement from Mr. Uhig. It's his computer. What's the IP address? Gave us the IP address. It gave us the internet service provider. Who's the internet service provider here? It was CenturyLink. And we had other evidence that showed it was CenturyLink in Mr. Uhig's computer. It talked about the file-sharing programs that were being run on the computer to which the law enforcement computer was connected, that it was the Nutella file-sharing network. That's not a statement by anyone. That's a computer talking to a computer. What's being run? Why don't you switch to the hard parts about it? What do you think are the hard parts, Judge? Well, how about the law enforcement information? I can go to that, Judge. Before I get to that, I'll let you. And she's complaining about the legal conclusion, as she calls it, that it is, in fact, child pornography, or has been identified as child pornography. And then I thought there was some stuff about agent notations on there. I thought those might be harder issues. OK, Judge, I'll get to that. Go ahead. One other thing I want to talk about, one in three, it also gives the keyword searches that Mr. Uhig had typed in the computer on Exhibits 1 through 3. So his statements through the computer to computer, here's what he was looking for that included terms like PTHC, Lolita, and 10-year-old. You said those are admissions by him, you mean? There's no case law on that, but it sure seemed darn close to it. In any event, it's a statement from one computer talking to another. It's not a law enforcement statement in there. It's the computer that Mr. Uhig is typing, is writing on. Some person caused it to. Mr. Uhig is the person who typed it on there. As far as the statements are concerned, what we have here in the CPS report and in the Shiraz Ali reports. So the Shiraz Ali reports are Exhibits 2 through 4, and they told the agent what his computer had downloaded. It gives the file names, the hash values, it gives the dates that the download started, and the dates that the download were completed. There is an annotation on there, on that report, and as well as a box, a pie chart on the CPS reports that describes some of the files on these exhibits as child notable is the exact terminology. It doesn't say child pornography on there, but it's telling the case agent that his computer has used its programming, what is in its database as child notable files, nude images of children, and found files of that sort on Mr. Uhig's computer. Yeah, yeah. So why isn't that hearsay? We could use guidance in that area, Your Honor. My argument at the district court level, when I mentioned this in my trial brief that we were going to offer this evidence at trial, the argument was that there is no statement in these programs, in this data exhibits 1, 3, 2, 4, by a declarant. A declarant is a person. A computer is not a person. The only case I could find that discusses this type of thing is a case from the 11th Circuit called Bates. In the Bates case, the analysis is really short. It says something on the lines of computer generated or machine generated data generally is not hearsay. However, sometimes when it relies on human input, it can be, and then it transitions right into harmless error. So it really doesn't provide any guidance at all to us. Well, why wouldn't it be? If it's relaying through the computer something and it's not relaying a human input, why wouldn't that be hearsay because it's the statement of the human who put the information? Your Honor, the conundrum is, and what we could use guidance on, the conundrum is any computer generated information certainly by necessity relies on input from human beings to generate whatever reports, whatever it's giving us. Absolutely. Somebody's got to write algorithms, but that's not the case here. What the case here, it's not that the program just is built by a person and just runs, right? The deal is somebody identifies by certain hash values that certain images are in fact child notable. Now that's a conclusion of some sort that a human being makes. A computer doesn't make that determination, right? Because they have to be identified somewhere else. They all come from the National Center. They come from other law enforcement agencies. Those get put into the computer. At least, I mean, the trials I sat through and I heard people describe them, that's what I hear. And then I've never seen a report like this come out and come in evidence about a real live human being explaining what it was, how it was produced, what the foundation was for its production, how it fit under the rules. We had that. We had actually the developer, Mr. Weltsy, who his company developed CPS and Shiraza LE. He was our first trial witness. And then Special Agent Simon testified about how he ran these programs that generated the documents. That's right. And so did he ever explain, and I didn't see it, but I might have missed it. Did he ever explain where the images were identified, how they were identified, who identified them? His affidavit just describes child notable means, blah, blah, blah. But I don't remember anything in the testimony saying that these images were designated as child notable because of something, right? Because you were talking more about the images themselves and the hash values at the trial, right? Yes, Your Honor. Right? And so at the end, it's probably mostly all about being harmless because it could have come in that way anyhow. And whether the exhibit's there or not, whatever. But the question is, if you offer the exhibit as substantive evidence that they are somehow child notable, which they're arguing to happen here, the problem is that no human being has ever said what child notable means and how it was calculated. We offered the exhibit, particularly one in three. One in three we offered for multiple purposes. Identity and knowledge are two of them because, again, it tells us about the IP address, the internet service provider, the program that was used, Nutella, which we found on his computer, and the keyword searches. What was he looking for and what was he typing? So those components, I don't think there's any hearsay problem with those components. I understand the concern as far as, when it says child notable, but again, I come back to where the law is unclear and there's no precedent there is, where are the lines drawn? Because every computer, every machine, if it's a, there's cases. Well, what was the record on how they came to be designated as child notable? I think Judge Erickson's right, Your Honor. There's this law enforcement gets the information on certain files. These have been identified by law enforcement as child notable files and they are put in a database by name and by hash value and then that's put in a program. So the hearsay rule is designed, I mean, if you go back to English common law and everything, it's designed, we want to bring the declarant in court. They should have to take an oath. They should have to be here in person and testify. They have to be subject to cross-examination. The computer can't take an oath. The computer can't testify and it can't be subject to cross-examination. So where that line is drawn. But if a witness had come in and said, I went through a bunch of files and designated them as child notable and put them into a program and this computer program then cross-referenced, seized images to see which of them match the ones I had previously designated and that's how the computer program works. Then you'd have a witness, you could cross-examine about how they were designated child notable in the first place. Judge, we could, but if you look at Exhibits 1 and 3, it didn't talk about specific files being child pornography. It had a pie chart that said we found 640 or whatever the number is, an N, a number of files that this computer has in its database, either the name or the hash value for it that it considers child notable. The next step then is to do downloads. That's Exhibits 2 through 4. Why does the government want this in, I guess? Because you have the images themselves, right? We did, Your Honor. Those were offered into evidence in two different forms. So I'm just wondering what's the value of these exhibits? The value of Exhibits 1 through 3, the 1 and 3, the CPS. The pie chart ones. Excuse me, Your Honor. The pie chart exhibit. What's the value of that? Well, as I just went through, the value of the CPS reports is to prove knowledge and to prove identity. It goes through his IP, it ties the IP address, gives us the internet service provider. It tells us the program that was used, that was found on his computer. And it does talk about that there's child notable files here, so why did we continue with the investigation? And what was this person looking for? PTHC, Lolita, a 10-year-old at the time. So all of that was activity that was going on in June of 2015. And I presume the investigator and the expert could have testified to all those things without the exhibit, right? They would say that, well, the exhibit was produced. It's something that we in our profession rely upon. We looked at it. And then we went back to the hard drive and started looking at what was on the hard drive. And we were able to identify and confirm that the report was correct, which... It could, but my conundrum there, Your Honor, is a verbal statement is no less hearsay than a written statement. Well, except they're an expert, they're relying on... On the pie chart. On the pie. They're relying, well, listen, everybody relies, I got a program, I put it out there, it tells me these are child notable. The expert says, whether he created this program, like your expert did, or he's just a person who's trained and used it. They all take the stand and say, this is a tool we use. Here's how it works. Here's what it showed. Then I went and looked at the hard drive. And then we go through the dance where they pull up the various images and they say, this is child pornography. This is... And it's all pretty straightforward. The only reason I'm asking, and it just is somewhat disconcerting to me, is that I'm not sure that this thing really adds... The admission of the exhibit itself, I'm not sure it really adds anything to the trial, except it does add a conundrum for us. Very well, Your Honor. At the end of the day, no matter what you decide, whether these exhibits are hearsay or not, or whether portions of them are hearsay or not, I think the case is resolved just like the Bates case was, and in other cases involving machinery, printing out reports under the harmless error analysis. What we have here is Mr. Uhig, not only confessed to Special Agent Simon in English, Mr. Uhig is bilingual. Special Agent Simon took the additional test of finding a local police officer who's a Bosnian native who spoke Mr. Uhig's native language, and after Special Agent Simon interviewed him and he confessed, also had someone talk to him, another law enforcement officer in his native language. So Mr. Uhig actually has the unique distinction in my experience of having confessed to receiving, possessing, and transporting child pornography in two different languages on the same day. I think it was October 5th or 6th of 2015. He told us that he was the person downloading this. He told us what computer programs he was using. He told us that he was doing this on his computer that was confirmed by forensics. He told us this was password protected. He told us he was hiding it from his wife. He told us there would be about 1,000 files of child pornography, and there were over 1,500 files of child pornography on there. Everything he told us pretty much in his two confessions, and that the children in the videos were between at least in the ages of nine to 14 that they were clearly minors and it was child pornography. Everything that he said was corroborated through the evidence in particular. Government Exhibit 5 shows the 52 files of child pornography that were downloaded from his computer, and Government Exhibit 17 was 23 videos of child pornography. Of the 52 that were still on his computer when it was turned over by him to law enforcement. So we didn't rely on the pie chart to prove that it was child pornography. We didn't rely on NCMEC to prove it was child pornography. We gave the jury the child pornography to look at. Based on- How does the judge get to the business records exception? Is that offered by the government? No, Your Honor. I've had this issue come up before about these reports. Sometimes they come in at trial, sometimes they don't. We had a case in front of the Eighth Circuit called Zvesky. This court affirmed, I can vividly recall, Defense Counsel Mr. Parrish in front of the jury using the pie chart and talking about it and everything. So these exhibits have, at least in our district, come into trial without objection before, and it is here. I wanted to red flag that issue up front for Judge Rose, so I put it in my trial brief that we were intended to use this. And that we thought that, again, these were not statements from declarants. This is data derived from a computer. When Judge made her ruling, she came up with the business records exception. Very well. Thank you for your argument. Thank you, Your Honor. I guess Ms. Quick has some time remaining, so we'll hear from you in rebuttal. I'd like to start by clarifying what happened when these exhibits were introduced and what it meant by child notable or known series. The testimony on Exhibits 1 and 3, when asked, what is a child notable value, the agent stated, so in CPS, a child notable file is just a category of file provided to us by law enforcement when they come across known child pornography. When looking at the file sharing reports, and that's on page 57, on page 113, when talking about Exhibits 2 and 4, and he's asking, what does it mean gray series? Does that have any meaning to you as an investigator? The answer is, it would tell me that it's most likely a known and identified victim that has been named. It's common for investigators, when we submit hash values to the National Center for Missing and Exploited Children, for them to return any files that are known child pornography and are series names. And I, next, looking at just the legal issue itself, whether it is hearsay, I apologize, I didn't realize Mr. Jewick's case was briefed before the Morrissey decision came down. But the Morrissey decision, and I can file a 28J, is clear, and that was a plain error case. And they say, we agree with Morrissey that the spreadsheet constitutes hearsay, as it was an out-of-court statement offered into evidence for the truth of the matter asserted that the images were child pornography. And that was plain error review. And my recollection, because that was my case, is that the government made the same arguments that they're making now, that it's computer-generated, and because of that notation, that it was confirmed child pornography, the circuit did disagree. If there are no other immediate questions, I would ask this court to reverse and remand for a new trial, for the reasons stated today and in our brief. Very well, thank you for your argument. The case is submitted. Thank you to both counsel. Court will file an opinion in due course. That completes.